IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 2, 2023 Session

**IN RE BROOKLYN M.[1]**

**Appeal from the Chancery Court for Sumner County
No. 2021-AD-32     Louis W. Oliver, III, Chancellor**

_____

**No. M2023-00024-COA-R3-PT**

_____

A father and stepmother appeal from an order dismissing their petition to adopt a child and to terminate the mother's parental rights. The trial court held that the evidence presented supported termination of the mother's parental rights based on her failure to support and failure to visit the child. However, the trial court found that the alleged ground of failure to manifest an ability and willingness to personally assume custody or financial responsibility of the child had not been proven. The court also found that termination of the mother's rights was not in the child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S, and ANDY D. BENNETT, J., joined.

Joel Stephen Mills, Nashville, Tennessee, for the appellants, Richard M. and Anna Renae M.

Nicholas Perenich, Jr., Nashville, Tennessee, for the appellee, Holly W.

Taylor M. Davidson, Hendersonville, Tennessee, guardian *ad litem*.

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

# OPINION

## I.     BACKGROUND

This appeal concerns Brooklyn M. ("child") who was born to Holly W. ("Mother") and Richard M. ("Father") in 2015.  Mother and Father's romantic relationship deteriorated, and Mother last saw the child in late December 2018 when she relapsed into drug and alcohol abuse.  Father began caring for the child along with Anna Renae M., the child's stepmother and prospective adoptive parent ("Stepmother" and, collectively with Father, "Petitioners").  Father and Stepmother wed in early January 2019.  Father was granted custody of the child on March 6, 2019.  Father and Stepmother filed a stepparent adoption petition on November 29, 2021, which also sought to terminate Mother's parental rights.  Mother answered on December 30, 2021.  On April 6, 2022, Mother surrendered her parental rights; however, she timely revoked the surrender.  Trial was held before the Sumner County Chancery Court ("trial court") on October 12, 2022, at which the following relevant evidence was presented.

Father and Mother began their romantic relationship in 2013, approximately two years before the child was born.  They never married.  Before she lived with Father, Mother abused cocaine, but she began a period of sobriety in April 2013 which lasted until late December 2018.  Father has a criminal history, including a conviction for simple robbery in 2014, for which he served jail time and a period of probation.  The conviction was eventually expunged.  Father testified that he has experienced no "trouble" since.  Before the child was born, Father suffered a motorcycle accident, causing serious injuries to his hip, collar bone, and back.  Following the accident, Father was prescribed pain medication, including Percocet and Oxycodone.  Father admitted that he became addicted to these pain medications from approximately 2014 to 2018, a period which partially overlapped with the child's early years, before he voluntarily "broke the addiction on his own."

During the child's first three-and-a-half years, she lived with Mother and Father in a home owned by Mother's grandmother in Springfield, Tennessee.  During this time, Mother cared for the child, was employed, and provided income for the family.  Mother testified that she was in recovery from drug addiction during the child's early years but was living with Father whom she said had an active addiction to pain pills.  Father was not employed.  He has received Social Security Disability benefits since 1999 due to ongoing mental health conditions and takes medication for seizures, mood swings, bipolar disorder, and schizophrenia.

Within a short period of time in late 2018, Mother learned that her mother died and that Father and Stepmother were in a romantic relationship.  According to Mother, these circumstances caused her to relapse into drug and alcohol abuse after five years of sobriety.  Father testified that Mother disappeared without notice on December 26, 2018, leaving the child with Mother's aunt.  Mother returned home on January 6, 2019, but Father and the

child were not there. When Mother called him, Father did not answer. Father testified that Mother's grandmother told him to leave the home sometime after Mother left.

Mother admitted to using drugs and alcohol after being informed that Father was leaving her for Stepmother. She contended that her relapse occurred on January 1, 2019, and that when she returned to the home on January 6, 2019, Father had left with the child.[2] Mother testified that she was distraught over the sudden upheaval of the relationship and turned to drugs and alcohol.

Father and Stepmother married shortly thereafter on January 9, 2019. Mother contacted Father in February 2019, seeking information about a federal income tax refund, and made contact over a period of about two weeks seeking to see the child. Thereafter, Father failed to answer the phone when Mother or any members of her family attempted to contact him, and he would not return their calls. During the February 2019 contact, Mother refused to advise Father of her whereabouts. Father told Mother that she needed to be "consistent" about contacting the child, which to him meant "checking in" every day or every other day. He testified that the child was "heartbroken" when Mother left, and he did not want her to go through that experience again. No visits were allowed by Father and Stepmother, and Father had no further contact with Mother from February 2019 until the instant petition was initiated in November 2021. Mother testified that in April 2020, she went to a courthouse to pursue the matter, but the court was closed due to the COVID pandemic.

In March 2019, Father petitioned for and was awarded custody of the child by the Davidson County Juvenile Court. Father testified that he did not know where Mother lived at that time, and she was apparently not served in this proceeding. The order stated that "Mother's whereabouts is currently unknown. Her rights are reserved." Father testified that he understood this language from the order, which was handwritten, to read that Mother's visitation rights and parentage were "revoked" rather than "reserved."

Father and Stepmother testified that the child was now integrated into their home, which also includes three additional step or half siblings. Father and Stepmother lease a five-bedroom house in Hendersonville, on which they hold an option to purchase. Father related that he does not work outside the home, and primarily cares for the minor children with a nanny's help. He explained that he takes the children to school in the morning, and they ride the bus home in the afternoons. Father and Stepmother take the children to various extracurricular activities as well as doctor and dentist visits. They testified that the child is doing well in her activities including dance, school, and in relationships with her friends.

---

[2] In its findings of fact, the trial court appears to have credited Father's testimony that Mother's relapse occurred on December 26, 2018.

At the time of trial, the child was seven years old and had not seen Mother since December 2018. Father testified that the child no longer remembered Mother, and the Stepmother testified that Mother was "a stranger to [the child] now." After Mother left, the child had "abandonment issues," and Father and Stepmother advised the child that they "[did not] know where her mommy [was]." The child suffered anxiety for about one year over Mother's absence. Father and Stepmother decided not to send the child to counseling. Stepmother testified that the child now calls her "mommy" and that she did so without coaxing.

Father shared that he receives $1,700 a month from Social Security Disability benefits. Stepmother owns and manages a "gentlemen's relaxation studio" in which the employees provide body rubs while wearing bikinis. Stepmother testified that the business grossed $570,000 in 2021. She stated that the studio was not a massage parlor and that her employees were not licensed massage therapists. She testified that, in addition to billing and bookkeeping, she trains the providers to administer body rubs. She stated that she "[has] to be careful about who [she] allow[s] in" to the studio because there are undercover police officers who visit the studio. She said that the police visits are to make sure "the girls that are doing the body rubs are not giving muscle manipulating massages . . . that their bathing suit is on at all times. . . ." Stepmother testified that the child thinks the business is a spa, and she is prohibited from visiting the business or its website, which shows photos of women in various stages of undress. Stepmother testified that she used marijuana, cocaine, LSD, and mushrooms when she was eighteen years old. She was convicted of six counts of robbery, which occurred between 2004 and 2006. She was incarcerated for two-and-a-half years and released in 2008. She testified that she has had "no trouble since." Stepmother testified that she would probably not talk to the child about being adopted until she was eighteen years old. Stepmother explained that she had previously discussed the adoption with the child and told her it "would mean that she would only have one mommy and not two anymore."

Mother obtained a full-time job in September 2021. She also quit using drugs that same month, meaning that her relapse was from December 2018 until September 2021. During those years, Mother went to rehab three times, was arrested twice, and participated in Davidson County Recovery Court. She completed various training programs, attended therapy, and established her own two-bedroom home in Donelson. Mother submitted the results of a hair follicle test taken in July 2022, which was negative for drug use. She testified that she continued to engage in activities to maintain her sobriety, including therapy, Narcotics Anonymous meetings, having a sponsor, working the twelve-step program, and keeping a network of family and other supporters.

Three family members testified on Mother's behalf. First, Mother's eighteen-year-old daughter, Kaitlyn G., testified. Kaitlyn is the child's half-sister. Kaitlyn was in her father's custody during her minority but was allowed to visit and talk with Mother. She spent weekends and time during the summers at Mother's home. Kaitlyn testified that she

previously saw the child quite often before Father cut off contact with Mother's family. She recounted that they went to the park, the movies, and Florida together. She testified that the child had a close relationship with all of Mother's family and that Mother was the primary caregiver for the child prior to January 1, 2019. Kaitlyn testified that Father told her not to speak to him anymore and that he blocked her from communication. She testified that she thought it would be in the child's best interest for Mother's parental rights not to be terminated, stating, "For [the child] to see her family like I did. It's important for her to see her sister, her mother. That's what was important to me as a child, and so I think that's important to her as well."

Mother's younger sister, Julianna W., also testified. She stated that she lived with Mother and Father for about one-and-a-half years around 2018, and she would babysit the child. Julianna testified that the child was bonded to her, they were together each day, they played together, and Julianna watched after the child when Mother worked. Julianna believed they were more like sisters than aunt and niece. Julianna recalled that Mother was there for the child all the time if she was not at work or running errands. Julianna testified that she saw the child approximately one year before trial when Father's family visited the restaurant where she worked. The child recognized her, hugged her, smiled, and called her "Johnny," which was the child's nickname for her.

The child's great grandmother, Marilyn W., also testified. She explained that she had a good relationship with the child prior to Father blocking her from calls, texts, and Facebook. Contrary to Father's testimony, she stated that she did not tell him to leave the house she rented to them. She said that the last time she saw the child was when Father came to her shop to ask for money to be able to feed the child, which she gave to him.

By order entered December 9, 2022, the trial court found that Mother had abandoned the child by failing to visit and by failing to support her pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(i). As for failure to visit, the trial court found that Father blocked both Mother and her family members from contacting the child, but that Mother "failed to take any affirmative action" to seek visitation through the Juvenile Court during the applicable four-month period, even after she became sober. The trial court further found that Father and Stepmother had not proven that Mother failed to manifest the ability or willingness to assume custody of the child. The trial court ultimately concluded that it was not in the child's best interest to terminate Mother's parental rights. In particular, the trial court found that Father and Stepmother would continue to have custody of the child unless Mother later chose to petition to establish a parenting schedule; that the child would benefit from re-establishing the significant relationships she previously had with Mother's side of the family; that Mother had demonstrated the ability and commitment to maintaining a home in which the child's needs would be met; and that Mother was able to provide safe, stable care for the child during any period they may be together. Following the trial court's dismissal of their petition, Father and Stepmother appealed.

## II.  ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A.     Whether there was clear and convincing evidence of the alleged grounds to terminate Mother's parental rights.

B.     Whether the trial court erred in finding that it was not in the child's best interest to terminate Mother's parental rights.

## III.  STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988).  This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions."  *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004).  "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent."  *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(l)(1)).  "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'"  *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds.  *See In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002).  Due process requires clear and convincing evidence of the existence of the grounds for termination.  *In re Drinnon*, 776 S.W.2d at 97.  A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c).  "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest."  *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).  The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights.  *In re C.W.W.*, 37 S.W.3d 467,

473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2012, a panel of this court described the clear and convincing evidence standard as a two-step process and provided as follows:

> Under the clear and convincing evidence standard, it is important to distinguish between the specific facts found by the trial court and the combined weight of those facts. Each specific underlying fact need only be established by a preponderance of the evidence. Such specific underlying facts include whether a particular injury suffered by the child was the result of nonaccidental trauma, and whether the caregiver's conduct with respect to the injury was knowing. Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse.

*In re S.J.*, 387 S.W.3d 576, 591–92 (Tenn. Ct. App. 2012) (internal citations and quotation marks omitted). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015) (citations omitted).

In 2023, the Tennessee Supreme Court provided the following further guidance to this court in reviewing cases involving the termination of parental rights:

> To review trial court decisions, appellate courts use a similar two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford

great weight to that determination and will not reverse it absent clear evidence to the contrary.

Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness.

*In re Markus E.*, 671 S.W.3d 437, 455–57 (Tenn. 2023) (internal citations omitted).

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995)); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "Thus, this court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV. DISCUSSION[3]

### A.

The trial court found that clear and convincing evidence established two grounds for termination of Mother's parental rights: abandonment by failure to visit and abandonment by failure to support. However, the trial court found that Father and Stepmother failed to prove a third ground for termination: failure to manifest an ability and willingness to assume custody or financial responsibility. On appeal, Mother challenges the first two grounds for termination, and Father and Stepmother challenge the trial court's dismissal of the third ground. We will consider each ground as required by our Supreme Court. *See In re Carrington H.*, 483 S.W.3d 507, 525–26 (Tenn. 2016) ("[T]he Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

---

[3] We will reference the statutes which were in effect when Father and Stepmother filed the petition for termination of parental rights on November 29, 2021.

*Abandonment by Failure to Visit*

Parental rights may be terminated for abandonment when a parent fails to visit a child for a period of four consecutive months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). A failure to visit "means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). The statute requires that parents offer their children more than "token visitation," defined as visitation that "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

A parent may assert as an affirmative defense pursuant to Tennessee Rule of Civil Procedure 8.03 that his or her failure to visit was not "willful." Tenn. Code Ann. § 36-1-102(1)(I). The burden is on the parent asserting the affirmative defense to prove by a preponderance of the evidence that his or her failure to visit was not willful. *Id.*; *In re Kolton C.*, No. E2019-00736-COA-R3-PT, 2019 WL 6341042 at *5 (Tenn. Ct. App. Nov. 26, 2019).

Here, Petitioners filed their petition on November 29, 2021, so the relevant four-month period is July 29, 2021 – November 28, 2021. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (statutory four-month period covers four months preceding the day the termination petition was filed and does not include the day petition was filed).

The trial court found that Mother had abandoned the child by failure to visit, having left the child in December 2018 and not having seen her since. The trial court acknowledged that Mother subsequently contacted Father in February 2019 seeking to see the child, and also credited Mother's testimony that she tried to seek information from the court in April 2020, but found the court closed due to the pandemic. The trial court found that Mother and her family members attempted to call Father "hundreds of times" regarding the child; however, Father would not answer the phone, would not return their calls, and would block their phone numbers. The trial court acknowledged that Mother's "periods of drug abuse and intoxication, incarceration, and rehabilitation treatment made it difficult for Mother to seek Court relief. . . ." However, the trial court found that Mother's cocaine and alcohol abuse were circumstances that were within her control and that, despite Father's blocking of communication, she "had the opportunity to seek relief from" the Juvenile Court "but failed to take any affirmative action." The trial court observed that Mother had been "clean of drugs and alcohol after September 12, 2021, approximately 2 ½ months prior to the filing of the instant petition, but still failed to seek visitation through the Juvenile Court."

- 9 -

There is no dispute that Mother did not visit the child in the four months immediately preceding the filing of the petition to terminate her parental rights. In her appellate brief, Mother argues lack of willfulness, arguing that her incarceration and Father's refusal of contact were circumstances outside of her control. However, Mother did not plead the absence of willfulness in her answer to the petition. Failure to plead an affirmative defense generally results in waiver of the affirmative defense. *See, e.g.*, *In re Isabella G.*, No. M2022-00246-COA-R3-PT, 2023 WL 1131230, at *9 (Tenn. Ct. App. Jan. 31, 2023) ("This Court has often held that this omission results in waiver of lack of willfulness as an affirmative defense.") (citing *In re Jaidon S.*, No. M2021-00802-COA-R3-PT, 2022 WL 1017230, at *5 (Tenn. Ct. App. Apr. 5, 2022); *In re Analesia Q.*, No. E2021-00765-COA-R3-PT, 2022 WL 1468786, at *5 (Tenn. Ct. App. May 10, 2022); *In re Christopher L.*, No. M2020-01449-COA-R3-PT, 2021 WL 4145150, at *5 (Tenn. Ct. App. Sept. 13, 2021)). On appeal, Mother does not argue that the issue was tried by consent. Accordingly, the issue of willfulness with respect to Mother's failure to visit is waived, and we conclude that the trial court did not err in finding that clear and convincing evidence supports this ground for termination.

*Abandonment by Failure to Support*

Abandonment can occur when a parent has "failed to support or [] failed to make reasonable payments toward the support of the child" for a period of four consecutive months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). The statute defines failure to support as a parent's failure "for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). By statute, parents are expected to offer more than "token support," which "means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). Furthermore, "[e]very parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children." Tenn. Code Ann. § 36-1-102(1)(H).

A lack of willfulness can constitute an affirmative defense to the ground of failure to support. Tenn. Code Ann. § 36-1-102(1)(I). A parent "shall bear the burden of proof that the failure to . . . support was not willful" and must establish the lack of willfulness by a preponderance of evidence. *Id.* Efforts to frustrate or impede a parent's visitation do not justify a parent's failure to financially support a child. *In re Audrey S.*, 182 S.W.3d at 864. There is no dispute that Mother failed to pay any child support after she left the home in December 2018. The trial court noted that Mother was employed on a full-time basis as of September 2021 but still failed to pay any child support.

On appeal, Mother asserts lack of willfulness, arguing that she could not pay child

support during the four months preceding the petition because she was living in a halfway house during some part of this time. Mother did not plead the absence of willfulness as an affirmative defense to her failure to pay support and does not argue on appeal that the issue was tried by consent. Accordingly, the issue is waived. *See In re Isabella G.*, 2023 WL 1131230, at \*9 (citations omitted). We conclude that the trial court did not err in finding that clear and convincing evidence supports this ground for termination.

*Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(14) parental rights may be terminated when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires the petitioner to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). First, a petitioner must prove that the parent failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *In re Neveah M.*, 614 S.W.3d at 674. Second, a petitioner must prove that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *Id.*

As to the first element, our Supreme Court has instructed as follows:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied.

*Id*. at 677 (citation omitted).

As to the second element, whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," we have explained:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray*, 83 S.W.3d at 732 (footnotes omitted)).

In this case, the trial court found that the preponderance of the evidence did not favor termination of Mother's parental rights under section 36-1-113(g)(14). On appeal, Father and Stepmother contend that the trial court improperly considered evidence occurring after the petition date. They also contend that the trial court reached the wrong conclusion based on the evidence. On appeal, Mother asserts that the petition did not allege section 36-1-113(g)(14) as a ground for termination of her parental rights and, therefore, that ground should be dismissed. We will first address Mother's argument.

"A parent's rights cannot be terminated pursuant to statutory grounds not alleged in the petition." *In re Tiffany B.*, No. E2020-00854-COA-R3-PT, 2021 WL 514299, at *8 (Tenn. Ct. App. Feb. 11, 2021) (citing *In re Tristyn K.*, No. E2010-00109-COA-R3-PT, 2010 WL 2867179, at *5 (Tenn. Ct. App. July 22, 2010) ("A trial court cannot terminate parental rights based on a ground that is not alleged in the complaint."); *M.D. v. R.L.H.*, No. E2005-00324-COA-R3-PT, 2005 WL 3115874, at *3 (Tenn. Ct. App. Nov. 22, 2005); *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (parental rights could not be terminated based on severe abuse when ground was not mentioned in prayer for relief)). "A court can terminate a 'parent's rights to [her] child based only upon the statutory ground(s) alleged in the petition because otherwise the parent would be disadvantaged in preparing a defense.'" *In re Lucas S.*, No. M2019-01969-COA-R3-PT, 2021 WL 710841, at *4 (Tenn. Ct. App. Feb. 24, 2021) (quoting *In re Anthony R.*, No. M2012-01412-COA-R3-PT, 2008 WL 2331037, at *4 (Tenn. Ct. App. Feb. 8, 2013) (other citation omitted)); *see also M.D. v. R.L.H.*, 2005 WL 3115874, at *3 ("The record contains nothing showing that the petition ever was amended to allege any additional ground upon which to terminate Father's parental rights. Absent evidence showing that Father was properly apprised that these additional grounds for terminating his parental rights were at issue, we must vacate the Juvenile Court's judgment insofar as it terminates Father's parental rights pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and (g)(4).").

In this case, Mother contends that the petition does not specifically allege termination of her parental rights based on section 36-1-113(g)(14). Mother points to

language in paragraph 35 of the petition, which paraphrases but does not cite section 36-1-113(g)(14):

> (d) Petitioners would show by clear and convincing evidence that the Respondent has failed to manifest an ability and willingness to assume legal and physical custody of the child.
>
> (e) Petitioners would show by clear and convincing evidence that placing custody of the child in the Respondent's legal and physical custody would pose a risk of substantial harm to the physical and psychological welfare of the child.

Mother states that this paragraph did not put her on sufficient notice that the petition sought termination under section 36-1-113(g)(14). Mother also points out that the prayer for relief does not specifically cite section 36-1-113(g)(14) as a ground for termination and that Petitioners' attorney did not refer to this ground in his opening and closing arguments but instead focused on the ground of abandonment. However, Mother's argument ignores entirely the fact that paragraph 39 of the petition specifically cites section 36-1-113(g)(14) as a ground for termination. ("It would be in the child's best interest under T.C.A. § 36-1-113(i) to terminate Respondent's parental rights under T.C.A. 36-1-113(g)(3), (g)(9), *and (g)(14)*." (emphasis added). We conclude that paragraph 35 and paragraph 39 of the petition sufficiently allege section 36-1-113(g)(14) as a ground for termination and that Mother was put on notice that this ground would be tried.

We now turn to the trial court's finding in Mother's favor, which Father and Stepmother contest. With respect to the ground of failure to manifest, the trial court found as follows:

> The Respondent/Mother was in a half-way house at the time the petition was filed on November 29, 2021 which could have been harmful to the physical or psychological welfare of the child if the child was placed to live with the Mother. The Mother obtained full time employment beginning September, 2021, and as of June 1, 2022 the Mother has resided separately at [her address] in Donelson, Davidson County, Tennessee. The Mother has been clean of drugs since September 12, 2021 and filed the results of a hair follicle drug test taken on August 4, 2022. Mother has completed various training programs including Centerstone Early Childhood Services Parenting, Stress Management and Life Skills class, Parenting Education classes; Tennessee Recovery Foundation Relapse Prevention Program, Intensive Outpatient Treatment Program, Outpatient MRT Group Program, and the Mother has continued to receive individual therapy. Father contends that Mother has not been clean a sufficient period of time, however, the Court finds that Mother was previously clean of drugs for a period of five years prior to December,

- 13 -

2018. Even though a period of adjustment for the minor child would be appropriate, the Court finds that to place the child in the legal and physical custody of the Mother would not pose a risk of substantial harm to the physical or psychological welfare of the child, nor does the Mother demonstrate that she has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. The Court finds that this ground has not been proven by clear and convincing evidence and therefore this ground [is] denied.

On appeal, Father and Stepmother argue that the trial court improperly considered evidence regarding Mother's ability and willingness to assume custody as of the trial date, rather than the date the petition for termination was filed. Father and Stepmother contend that Mother was living in a halfway house when the petition was filed and could not have assumed custody at that time. They argue that it was improper for the trial court to have considered her improved living conditions as of the trial date. We respectfully disagree. Although the "most relevant timeframe" for assessing the ground of failure to manifest is the "time preceding the filing of the petition to terminate parental rights," we have previously explained that the trial court "may also consider the parent's actions following the filing of the petition and up to the time of trial." *In re Kyland F.*, No. E2019-01058-COA-R3-PT, 2020 WL 957647, at *8 (Tenn. Ct. App. Feb. 27, 2020) (citing *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017); *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. April 4, 2018)); *see also In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *7 (Tenn. Ct. App. Apr. 23, 2020). We discern no error in the trial court's consideration of evidence after the petition date with respect to this ground for termination.

Father's and Stepmother's remaining arguments are that the trial court reached the wrong conclusion based on the evidence. They argue that Mother and the child do not have an existing relationship, that Mother would be a stranger to her, and that Mother lacks the ability to care for or assume custody of the child. The trial court considered testimony along these lines from Father and Stepmother. The trial court also heard testimony that Mother obtained full-time employment and adequate housing, stopped using drugs, and successfully completed a number of rehabilitation programs and classes. Having reviewed all the evidence, the trial court determined that Father and Stepmother failed to establish by clear and convincing evidence the ground of failure to manifest an ability and willingness to assume custody or financial responsibility. We conclude that the record supports the trial court's conclusion.

B.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, the trial court was required to consider whether

termination of Mother's parental rights was in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a termination ground, "the interests of the parent and the child diverge" and the court focuses on the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* Because some parental misconduct is redeemable, Tennessee's termination of parental rights statutes recognize "that terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555. After making the underlying factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The statutory best interest factors applicable to this action are as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic

symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific

needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

Of these twenty statutory factors, the trial court concluded that two favored termination of Mother's parental rights, two were neutral, two were inapplicable,[4] and fourteen did not favor termination. Because many of these factors touch on similar factual predicates and involve similar issues, we group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case. *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14

---

[4] The trial court found Tennessee Code Annotated section 36-1-113(i)(1) subsections (L) and (N) to be inapplicable. We agree and, therefore, omit these factors from further discussion.

(Tenn. Ct. App. May 15, 2023).

We consider first the child's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect the child's wellbeing), (D) (concerning the parent-child attachment), (E) (concerning visitation), (H) (concerning the child's attachment to others), (I) (concerning the child's relationships with others), (T) (concerning the parent's fitness and its corresponding impacts). With respect to these factors, the trial court found that Mother was the child's primary caretaker from her birth in May 2015 until late December 2018 when Mother relapsed and left the home. The trial court found that Mother failed to maintain regular visitation or other contact since then. The trial court observed that Mother and the child "do not presently have a secure and healthy parental attachment" based on this lapse in contact but noted that Mother had gone through extensive rehabilitation and "has significant family support." The trial court concluded that there was a "reasonable expectation with appropriate counseling and therapy for a healthy parental attachment to be established between the minor child and the Mother."

Concerning the child's attachment and relationships with others, the trial court found that she had created a "healthy personal attachment" with Stepmother and had begun calling her "mommy" of her own volition. The trial court also found that the child had "developed emotionally significant relationships" with her half-siblings and stepsiblings in Father's and Stepmother's home. The trial court characterized these relationships as "favorable and supportive to the child." The child formerly had relationships with members of Mother's family including Kaitlyn G. and Julianna W. The trial court found that these "significant relationships" on both sides of the child's family "will continue on a favorable basis" and the child would benefit "by renewing her relationships with her Mother's relatives."

With regard to stability and a possible change in caretakers, the trial court placed particular significance on the fact that it was not determining custody of the child. The trial court noted that "a change of caretakers and physical environment on a permanent basis is unlikely to occur" and would ultimately be decided by the Juvenile Court.

We turn next to the trial court's consideration of the child's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home). With respect to these factors, the trial court found that prior to December 2018, "Mother was the primary parent providing safe and stable care" and that Father and Stepmother had also "provided safe and stable care for the child as well as their other children." The trial court found that Mother "demonstrated the ability and commitment to establishing her own separate home that would be adequate for the child and the Mother to live." The trial court noted that Mother's has a "2-bedroom house with a fenced backyard

- 18 -

in a good neighborhood" in which the child's needs could be met and "in which the child can thrive."

Next, we consider Mother's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), and (K) (involving the parent's use of available resources). The trial court observed that both Mother and Father were "addicted to controlled substances for periods in their life." The trial court noted that "Mother was clean and sober" for five years prior to December 2018 and "has again been clean since September, 2021." She participates in rehabilitation programs, therapy, and "support groups and other activities which assist her in maintaining her sobriety and positive outlook." The trial court acknowledged the risk of relapse by Mother but found that "the child would certainly be protected in the home of the Father and Step-Mother" should relapse occur. The trial court also found that, in addition to establishing her own home, Mother had full time employment and "continuity and stability in meeting the child's basic material, education, housing, and safety needs. The trial court observed that should Mother's "continuity and stability come [into] question, the Juvenile Court may make such adjustments in placing the child with the Father and Step-Mother as it deems appropriate."

With regard to support and knowledge of the child's needs, Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing the parent providing more than token support), (P) (addressing the parent's understanding of the child's needs), the trial court found that Mother had financially supported and cared for the child for the first three-and-a-half years of the child's life and "demonstrated an understanding of the basic and specific needs required for the child to thrive." The trial court found that although the child was seven years old at the time of trial, Mother had an understanding of the needs required of a child that age. Regarding financial support, however, the trial court found that Mother had not consistently provided more than token financial support after she left the home in December 2018. The trial court noted that Mother was earning approximately $1,000 per week in full-time employment and would be able to support the child going forward.

On appeal, Father and Stepmother contest a number of the trial court's conclusions. However, their arguments essentially rely on favoring their testimony over that proffered by Mother and her witnesses. The trial court considered all of the evidence, weighed the credibility of the witnesses, and concluded that the best interest factors did not support termination by clear and convincing evidence. Upon review of the evidence, we agree with the trial court's assessment and findings. Accordingly, we conclude that clear and convincing evidence in the record does not support a determination that it was in the child's best interest for Mother's parental rights to be terminated.

## V. CONCLUSION

The trial court's judgment is affirmed. The case is remanded for such further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are taxed to the appellants, Richard M. and Anna Renae M.

_____
JOHN W. McCLARTY, JUDGE